## THE CITY OF OTTAWA
### *v.*
### GEORGE W. YENTZER.

*Filed at Ottawa March 28, 1896.*

1. HIGHWAYS—*by prescription—travel must be on a definite line.* A highway by prescription is not created by public travel over the land generally, not confined to a definite and precise line, without any assumption of authority over it by the public authorities.

2. SAME—*effect of laying out road and filing plat when not followed by user.* The laying out and filing of a plat of a road under the act of February 18, 1837, providing that the road, when located, shall be a State road and be opened and kept in repair as other State roads are, do not constitute the road so laid out a public highway, where it was never opened or used for public travel and the public authorities exercised no authority over it. (Language used in *Ferris* v. *Ward*, 4 Gilm. 499, criticised.)

3. EVIDENCE—*of dedication of highway must be satisfactory.* Proof of an actual intention to dedicate, or of acts and declarations equitably estopping the owner from denying such intention, must be very satisfactory to divest the owner of land under a claim that it has been dedicated by him as a highway.

4. SAME—*declarations of owner affecting dedication are admissible.* The declarations of a land owner made at the time of doing acts

claimed to have constituted a dedication, and also his subsequent declarations and acts, are admissible in evidence to show such owner's intention.

5. DEDICATION—*of highway—fencing out a strip is not a dedication.* The construction of a fence by a land owner so as to leave out a strip claimed to be a highway is not conclusive of a dedication.

6. SAME—*fencing out strip believed to be already a street—effect.* The building of a fence by a land owner, leaving out a strip in the mistaken belief that it is already part of a public street, will not constitute a dedication of the land.

7. SAME—*use of land as a highway by sufferance for several years not a dedication.* That a strip of land was, at the time of a purchase, in 1889, and continuously thereafter, used as a road, and that the purchaser gave the city no notice of any claim of ownership until 1892, do not show a dedication, where the city did not, until a year after the latter date, attempt to do any work upon the premises, and the public use was merely by sufferance.

APPEAL from the Circuit Court of LaSalle county; the Hon. DORRANCE DIBELL, Judge, presiding.

A. E. WHEELER, for appellant:

Slight deviations in the line of travel, to avoid a temporary obstruction, will not defeat the prescriptive right. *Gentleman* v. *Soule*, 32 Ill. 278.

Where a public road runs across private property, and is used by the public without interruption for twenty years, the owner acquiescing in such user, the law presumes a dedication. *Green* v. *Oakes*, 17 Ill. 251.

The interruption, to defeat the right by prescription, must be an interruption of the right, and not simply the use or possession. *Toof* v. *Decatur*, 19 Ill. App. 208.

The user of a road by the public as a public highway for the period of twenty years confers the right to use it against the true owner. *Daniels* v. *People*, 21 Ill. 442; *Town of Lewiston* v. *Proctor*, 27 id. 419.

No particular form is required to the validity of a dedication. It is purely a question of intention. *Maywood Co.* v. *Village of Maywood*, 118 Ill. 69.

Although an owner may never have intended to dedicate, yet his actions may have been such as to equitably

estop him from denying such intention. *Chicago* v. *Hill,* 124 Ill. 653; *Waggeman* v. *North Peoria,* 42 Ill. App. 138.

The fencing out of a strip of land by the owner affords very strong evidence of its being left out for a street, and should be accepted as satisfactory evidence of a dedication. *Chicago* v. *Hill,* 124 Ill. 653; *O'Connell* v. *Bowman,* 45 Ill. App. 666; *Maltman* v. *Railroad Co.* 41 id. 236.

Any act on the part of the public which manifests an intention to accept, such as public travel and use as a highway, is as satisfactory evidence of acceptance as repairs by the officers. *Marcy* v. *Taylor,* 19 Ill. 636; *Storm* v. *Burger,* 43 Ill. App. 175; *Littler* v. *Lincoln,* 106 Ill. 368.

The general public can manifest its acceptance by using the road, and thus acquire a right of way. *People* v. *Comrs. of Highways,* 52 Ill. 501.

The public is an ever-existing grantee, capable of taking dedications for public uses, and its interests are a sufficient consideration to support them. *Cincinnati* v. *Lessees of White,* 6 Pet. 431.

Acceptance on the part of the public will be presumed from slight circumstances. *Mann* v. *Elgin,* 24 Ill. App. 423.

E. C. SWIFT, and SNOW & HINEBAUGH, for appellee:

The subsequent act of Rees in fencing up the strip and using it for a long time overcomes any presumption of dedication or intent to dedicate. Elliott on Roads and Streets, 130, notes 3, 4; *Grube* v. *Nichols,* 36 Ill. 92; *Fisk* v. *Havana,* 88 id. 209; *Kelly* v. *Chicago,* 48 id. 389; *Harding* v. *Hale,* 61 id. 192; *Insurance Co.* v. *Littlefield,* 67 id. 368; *Chicago* v. *Stinson,* 124 id. 570; *Brushy Mound* v. *McClintock,* 150 id. 129; *Manrose* v. *Parker,* 90 id. 581.

Dedication is well defined to be "an appropriation of land to some public use, made by the owner of the fee and accepted for such use by or on behalf of the public." Angell on Highways, (3d ed.) chap. 3, sec. 132.

Evidence of dedication of land for a street must be cogent and persuasive, and not contradictory. *Landis* v. *Hamilton,* 4 Am. & Eng. Corp. Cas. 491; *Herhold* v. *Chicago,* 108 Ill. 470; *Proctor* v. *Lewiston,* 25 id. 140.

Mr. JUSTICE BAKER delivered the opinion of the court:

This was ejectment brought by Yentzer, against the city of Ottawa, to recover possession of the east forty feet of lot 1, in block 39, in the original town of Ottawa, which strip of land was being used by the city as a public highway. The original town of Ottawa was platted in May, 1837, by the canal commissioners of the Illinois and Michigan Canal, and was located on a part of the land conveyed by the United States to the State of Illinois in March, 1827, for canal purposes. The issues formed in the action were submitted to the circuit court of LaSalle county without the intervention of a jury, and the court found for the plaintiff, and that he was the owner in fee simple of the premises, and rendered judgment that he recover possession and that a writ of possession issue. From that judgment the city prosecuted this appeal.

The plaintiff below, Yentzer, made out a *prima facie* case by showing the facts first above stated, and by further showing that the canal commissioners had authority, under an act of the legislature, to sell and convey the land in question, and that they conveyed lots 1 and 2, in block 39, original town of Ottawa, to John G. Nattinger; that said Nattinger sold and conveyed said lots to William P. Rees, and that said Rees afterward conveyed the same to him, said Yentzer. The burden was then shifted upon appellant to establish a defense. This the city undertook to do by showing, first, that the strip of ground in controversy was a public highway by prescription; second, that there was a common law dedication of said strip as a public highway; and third, that a public road was legally laid out and established thereon.

The case will be more readily understood by making reference to the following diagram, which we find in one of the briefs:

North of Prospect avenue there is a high and steep bluff. The letter "B" marks the south-east corner of section 11, township 33, north, range 3, east, and the south-

west corner of the south-west quarter of section 12; and it is also the south-east corner of the original town of Ottawa, and of lot 1, in block 39, in said town. The line from "B" to "Z" is the section line between sections 11 and 12, and at the same time the east line of lot 1 and of the original town. Bloomington road is seventy-three feet wide, runs south from Van Buren street, and lies forty feet on the west side and thirty-three feet on the east side of the section line. All the land lying east of the section line, both north and south of the line of Van Buren street, was until lately either unimproved and unfenced, or used as agricultural and farming land.

The first contention made is, that the property described in the declaration has been used by the public as a public highway for more than forty years. Lots 1 and 2 were platted each eighty feet wide and three hundred and eighty-four feet deep. Prior to the time that Rees bought them, in 1875, they were unenclosed prairie, lying in the extreme south-east corner of the town and in an unimproved neighborhood, and until shortly before that time all the land to the east and south-east of them was also unfenced and unimproved. Most of the travel from the Bloomington road, and from east and south-east of the junction of that road with Van Buren street, turned west on Van Buren street, but part of it went north, or in a north-westerly direction, until it reached Prospect avenue, and then turned west. The testimony introduced by appellant tends to prove that the travel that did not turn west at Van Buren street went straight north from that street on the section line and on the east half of lot 1 until it reached Prospect avenue, when it turned west on said avenue. We think, however, that the weight of the evidence is that the general line of travel between Van Buren street, at the section corner, and Prospect avenue, was in a north-westerly direction and diagonally across lots 1 and 2, the objective points being the junction of Van Buren street and the Bloomington road at

the section corner, and the north-east corner of Mace's house and premises on lot 3, said house fronting on Prospect avenue and said premises being one hundred and sixty feet west of the section line and of the north-east corner of lot 1. The general direction of this travel is indicated on the diagram by the dotted line extending from "B" to "E," but, of course, since the travel was not always along the same tracks or path, said line only shows the general course of travel.

This view, which is in consonance with the testimony for appellee, is fortified by statements made by some of the witnesses for appellant. Thomas Mason says: "A good many teams used to go on what is now called Prospect avenue,—go around the corner of Mace's house, which was on lot 3, I think, on that block, and then go diagonally across. Some of them went south and some went east." John Collings, speaking of the traveled road, says: "Well, it kind of covered the whole ground. There was tracks right down to Prospect avenue, and sometimes scattered and diagonally across that same tract of land. There was no fence on that piece of ground. There didn't appear to be any sharp corner. People covered the whole ground. People used to go across from Mace's corner—right over to the Bloomington road—right over that way. Some went east to the fence and went directly south, or they went everywhere. It was track all over." And Isaac Reed says: "I don't think that the east forty feet of lot 1 was used any more during all this time for a street than any other part of lot 1. It was used all the same, I presume. No fence, and nothing to interrupt travel, but teams went where they pleased."

The only testimony that we find in the record tending to show any assumption of authority over the supposed public road by any of the public authorities, prior to the sale to Rees in 1875, is that of Peter Miller, who testifies that as chairman of the street committee of the city of

Ottawa he had the street supervisor, about the year 1864, grade up, level and gravel a street on the line and of the full width of the Bloomington road, from Prospect avenue to Van Buren street, and make ditches on the sides of such road. There seems to be no evidence corroborative of this testimony, and in view of the testimony of numerous other witnesses in the case we are satisfied that Miller, from a defective memory, is mistaken as to the piece of road on the south side of the city of Ottawa it was upon which he caused work to be done fully thirty years prior to his examination as a witness.

In *Warren* v. *Town of Jacksonville*, 15 Ill. 236, this court said (p. 241): "While so much land lying in common in this country remains free to public uses and travel until circumstances induce owners to enclose, we can deduce no strength of inference or conclusion from mere travel across it by the public without objection from the owner. It is neither the temper, disposition, fashion or habit of the people, or custom of the country, to object to community enjoying such privilege until owners wish to enclose." In *Kyle* v. *Town of Logan*, 87 Ill. 64, it was held that the public does not acquire a public road over vacant and unoccupied land by travel over the same for twenty years or more, merely from acquiescence on the part of the owner, in the absence of his doing some act or suffering some act to be done from which it can be fairly inferred he intended a dedication to the public. In *City of Chicago* v. *Stinson*, 124 Ill. 510, it is held that where land has been unenclosed for more than twenty years, as well as that lying around it, the mere fact that parties may have traveled over it in passing back and forth between a street and an avenue does not, of itself, indicate an intention to dedicate the land so used as a public highway. And in the late case of *Town of Brushy Mound* v. *McClintock*, 150 Ill. 129, it is held that the use of private property, to ripen into a prescriptive right, must be adverse to the owner, and that mere permissive use is never sufficient,

and that in order to establish a public highway by prescription over unenclosed lands there must be something more than mere travel over it by the public. Besides this, it was held in *Gentleman* v. *Soule*, 32 Ill. 271, that while it is true that travel may slightly deviate from the thread of the road to avoid an obstruction and still not change the road itself, yet that a prescriptive right can not be acquired to pass over a tract of land generally, but it must be confined to a specific line or way,—to a definite, certain and precise line. See, also, *Owens* v. *Crossett*, 105 Ill. 354.

In view of the evidence and of the cases we have cited, we are unable to say that the trial court erred in finding that no prescriptive right to a public road over the east forty feet of appellee's lot was shown by appellant.

Has there been a common law dedication of the east half of the lot as a public highway? Before the owner of real estate can be divested of his property by a claim that land has been dedicated by such owner to the use of the public, the proof must be very satisfactory, either of an actual intention to dedicate, or of such acts or declarations as should equitably estop the owner from denying such intention. *Waggeman* v. *Village of North Peoria*, 155 Ill. 545, and cases there cited.

There seems to us to be no plausible ground for the suggestion that it may be inferred from the evidence that there was a dedication by Nattinger, the grantor of the grantor of appellee. While he owned the lots they were vacant, and the only evidence from which any inference can be drawn as to his understanding and intentions in regard to the matter of a street on the east side of said lots is inimical to any presumption of the existence of such street. It is found in the testimony of J. E. Porter, who testifies that in 1865 or 1866 Nattinger wanted to sell the lots to him, and took him over to look at them, and, in answer to an inquiry, represented that the lots were each eighty feet wide.

When Rees bought the lots, in 1875, he located and built his house near the north end of the west half of lot 1, and on a range with the buildings along the west side of the Bloomington road, south of Van Buren street, and he constructed his fence on a line to correspond with the fences south of Van Buren street and along the west side of said road.   These acts tend strongly to show that it was his intention to dedicate the strip forty feet wide that he fenced out, for the purposes of a public highway. But they are not conclusive evidence of a dedication, and are open to explanation.   The mere acting so as to lead persons to suppose that a way is dedicated will not amount to a dedication, if there is an agreement or other matter which explains the transaction.   But it is otherwise if the acts are unexplained.   (*Marcy* v. *Taylor*, 19 Ill. 634.)   In *Proctor* v. *Town of Lewistown*, 25 Ill. 139, this court said: "It did not conclusively follow because the defend-· ant, when he fenced his land, left out a strip of the width convenient for a road, that he designed to dedicate it to the public for that purpose.   The fact of dedication depended entirely upon the intention of the party who is alleged to have made it.   *   *   *   It was the right of the defendant to have his declarations, as well as his acts, go to the jury as evidence of his intention.   Nor should he be confined to acts and declarations made at the time when he placed the fence upon the line of the alleged road, but his subsequent acts and declarations should all go to the jury."   In *City of Chicago* v. *Johnson*, 98 Ill. 618, it was said (p. 621): "Every act   *   *   *   relied on as showing a common law dedication of the premises to the public for a street is susceptible of an explanation consistent with the theory there was no such dedication," and it was there held that the building of a sidewalk on a lot by the owner of the same, so as to show ground left for a street, said sidewalk being made in obedience to the requirements of an ordinance and under the mistaken belief that a part of the lot had been condemned, is not

evidence sufficient to show a common law dedication. In *City of Chicago* v. *Hill*, 124 Ill. 646, there had been use of the ground for a long time by the public for the purposes of travel, and the owner had placed fences on the west and north sides of his lot, just thirty-three feet within both the west and the north lines of his lot, thus fencing out two strips of thirty-three feet each, and these strips apparently formed and were used as parts of streets that were each sixty-six feet wide, and yet it was held, under the countervailing evidence found in that case, that there was no dedication. And in *Waggeman* v. *Village of North Peoria, supra*, it was held that fencing out a strip of land corresponding in width with and forming a continuation of an existing street, and planting a line of shade trees in line with those on such street, do not constitute a dedication of the land, where both the declarations and acts of the owner show he did not intend to dedicate, but that he left the strip in the expectation it would be condemned for a street by the village.

Let us examine and see what the conduct of Rees, the grantor of appellee, was, and what his intentions were in respect to the supposed public highway. In August, 1875, intending to move to town, he was looking around for a lot on which to build, and Nattinger proposed selling him the two lots under consideration. He looked at them on his way home, and came back the next day and bought them. He neither asked nor received any information as to the dimensions or lines of the lots. He immediately made preparations to build, and saw there was a street—Prospect avenue—on the north of his lots, and another street—Van Buren street—on the south of them, and that the Bloomington road, seventy-three feet wide, ran south from Van Buren street. The land east of his premises and of the section line was fenced, and was owned and occupied by one Schreeb, and Schreeb's fence, being built on the section line, projected a distance of thirty-three feet into what would be a continuation of

the Bloomington road north of Van Buren street, thus making a jog at the section corner. Rees says in his testimony that he "just took from the looks of what was south" of his premises, and put his buildings and fence "on a range" with that, "supposing there was a street ran down or would run down there." To the question whether he intended to create a street by putting his fence where he did, he answered: "Well, I don't know as I thought of it in that way. Of course, when I built, south of me here it looked, of course, like a street, and a street north of me. There was a street running on through, and I set my buildings. A street was south and a street north, and it looked like there ought to be a street there. I supposed there was a street, or would be, there, and I didn't think anything about giving it at all." Rees further states that he used the unenclosed strip, and that any one that happened to drive around there used it, but that there was not a great deal of travel on it; that no work was done on it by the highway commissioners or the city authorities, or by anybody except himself, and he kept the weeds mowed down; and that after two or three years, no work being done on it and Schreeb's fence not being taken away, he saw from the appearance that there was no street there and fenced the strip across at each end by joining on to Schreeb's fence and putting in bars at both ends. This fencing up of the strip was done in May or June, 1878. He kept his cow in the enclosure at night, and frequently turned his horses in there during the day and summer nights. He kept the bars up for three or four years, and then took them out for his own accommodation, as he found it inconvenient to let them down every time he wanted to drive in or out. A few years after removing the bars he took most of the boards off of the fence but left the posts standing. He says in his testimony: "I had not given it up. I kept my posts. I wished to hold possession. I kept enough

there under advice, as I supposed I was holding my land, you know."

The testimony of Rees is corroborated by that of the other witnesses in the case, and is not contradicted, and we are satisfied that he has stated the facts substantially as they are. And we think it cannot be justly claimed, in view of the evidence in the record, that it is very clear and satisfactory that Rees, either at the time he built his first fence or when he removed the bars and boards from his second fence, intended to dedicate the east forty feet of lot 1 for a public road. He was evidently ignorant of the dimensions and lines of the lots bought by him, and manifestly built his house and fence under the mistaken belief that the land fenced out was already a part of a public street. We think the evidence satisfactorily explains all his conduct in regard to the lots, and that, considered as a whole, it is consistent with the theory that there was no dedication by him, and these conclusions are fully sustained by the cases to which we have already made reference. Nor do we find in the case the elements of an equitable estoppel as against him and his grantee, growing out of the fact that in 1887 the Highland syndicate bought the property east of the section line and platted it, and threw out thirty-three feet along that line for the purposes of a street that should correspond in width with the adjoining streets.

The fact that appellee bought the lots from Rees and moved onto them in 1889, and that the strip of forty feet was at that time, and continuously thereafter, used by the public as a road, and the further fact that he gave the city no notice of claim of ownership until 1892, do not show a dedication. The evidence shows that the city did not, until a year after the latter date, do or attempt to do any work upon the premises, and the public use was merely by sufferance. The fact that the owner permits a roadway to be constantly used by the public for a number of years, and fails to either enclose his premises

or institute suit, does not establish an intention to dedicate. *Kelly* v. *City of Chicago*, 48 Ill. 388.

It appears that Rees paid taxes on the whole of lots 1 and 2 from the time he purchased them down to and including the year 1888, and that appellee paid taxes on the whole of lot 1 from 1889 to 1893, inclusive. The payment of taxes assessed by the local authorities is evidence tending to defeat the presumption of a dedication. (Elliott on Roads and Streets, 131; *Waggeman* v. *Village of North Peoria, supra.*) It is, however, under most circumstances, a matter of but small probative force, and if the land is in fact dedicated to the public for a highway, the fact it has been taxed will not prevent the public from claiming the use of such land for a public road. *City of Chicago* v. *Wright*, 69 Ill. 318; *Town of Lake View* v. *LeBahn*, 120 id. 92.

The final claim made is, that a public road was legally laid out and established on the land in controversy. This contention is based on an act of the legislature of the State, approved February 18, 1837. (Laws of 1836-37, p. 213.) By that act three commissioners were appointed to view and locate a road from Danville, in Vermilion county, to Ottawa, in LaSalle county, and they were authorized to survey, mark and locate said road, and return to the county commissioner's court of each county through which it passed, a plat of said road, which was to be filed in the office of the clerk of said court, and it was provided in said act that "the said road, when thus located, shall be a State road, and shall be opened and kept in repair as other State roads are." It appears from the record of the county commissioner's court of LaSalle county, that on December 5, 1837, the commissioners appointed to locate the road presented to the court a report and map of said road, which report and map were accepted and approved by the court and ordered to be filed.

The field notes and map show that, coming from Danville, the course of the proposed road was north for over

a mile to the section corner, which is the south-east corner of the east forty feet of lot 1, from thence north to the top of the hill, and from thence north to the Illinois river. The report of the commissioners further shows that the road as laid out and platted by them was fifty feet in width, and on the west side of the lines of courses described and located on the map. It follows that the State road so located was located on the east fifty feet of lot 1 instead of on the east forty feet of said lot, and south of the junction of Van Buren street and the Bloomington road was located on the fifty feet immediately west of the section line that runs south on said Bloomington road, instead of on the forty feet lying west of said section line.

The language of the act is not simply that "said road, when thus located, shall be a State road," but it goes further, and says in addition, "and shall be opened and kept in repair as other State roads are." In the case before us, appellee made out a *prima facie* case entitling him to recover possession of the premises, and appellant assumed the burden of affirmatively showing that the strip of land in controversy in fact became and is a public highway. It has not done this, since it has failed to show that the road was ever opened or used for public travel, either at the place in question or at any other part of its line from Danville to Ottawa, or that the public authorities ever attempted to open it or any part of it, or keep it or any part of it in repair. On the contrary, the evidence tends strongly to show that the proposed State road never was or became anything more than a mere paper road. The Bloomington road is seventy-three feet wide, and only forty feet of this width is on the west side of the section line, and this apparently indicates that said road is not the State road fifty feet wide on said west side that the commissioners located in 1837. The testimony of numerous of appellant's own witnesses shows that at an early day, and prior to 1860,

the only line of travel from the south and east came across the country from the south-east and passed in a diagonal direction across the line of the supposed State road. The evidence, as a whole, seems to point to the conclusion that the local authorities failed to open for public travel and assume the burden of keeping in repair the road that was surveyed and marked by the commissioners appointed by the act of the legislature; that the canal commissioners made the plat that appears in the record, and included in lot 1 the strip of ground in dispute, and sold and conveyed said lot to the grantors of appellee, and that the intention to open the proposed road was abandoned.

Appellant seems to rely on *Ferris* v. *Ward*, 4 Gilm. 499, and other like cases, and places emphasis on certain language found in the opinion in the case named, as follows: "The road is established, and, in contemplation of the law, opened, when the court have approved of the report and have sanctioned the location." This sentence was wholly unnecessary in the decision of the case, as appears from the immediately following statement, which is: "If, in pursuance of such order, the road has been actually opened by the supervisor, has been worked upon and used for a considerable time, as the proof shows in the present case," etc. The sentence first quoted is, perhaps, not strictly accurate in its statement that the approval of the report and location is, in contemplation of law, the opening of the road. In the more recent case of *Wragg* v. *Penn Township*, 94 Ill. 11, it is said (p. 26): "The opening of a highway for travel, under the statute, is accomplished by removing obstructions existing at the time the highway is established, and it is not essential to the opening of a highway that unlawful obstructions subsequently erected thereon should be removed." And the statutes do not seem to recognize that the establishment of roads by an order of court or other public authority, or the laying out of roads, are synonymous terms

with the opening of roads. It is expressly provided that all highways laid out by order of the commissioners, or supervisors on appeal, shall be opened within five years from the time of laying out the same, and that if they are not opened within that time they shall be deemed to be vacated. Laws of 1861, p. 263; Rev. Stat. 1874, p. 932.

The cases relied on by appellant,—*Nealy* v. *Brown*, 1 Gilm. 10, *Ferris* v. *Ward*, 4 id. 499, and *Dumoss* v. *Francis*, 15 Ill. 543,—are not in point. They were all cases involving roads that had been actually opened and traveled by the public, and the ground of the decisions was, that in those cases it was not necessary to make proof of the steps preliminary to the establishment and opening of the roads. The "roads" which now are and for many years have been "declared to be public highways," (Rev. Stat. 1845, chap. 93, sec. 4; Rev. Stat. 1874, chap. 121, sec. 1; Laws of 1887, p. 263; Hurd's Stat. 1893, chap. 121, sec. 1;) are roads which have been actually opened or used,—places that are or have been open ways, in fact,—courses through or by which the public might pass,—and not mere paper roads, that may at some time have been authorized to be opened but never in fact opened.

It is a matter of State history and general knowledge that in early days and the days of special legislation very numerous acts similar to that which is now in question were passed by the General Assembly; and it is also a matter of common information and knowledge that in many instances the roads for which provision was made were not, and never have been, opened or used, and that all that was done in regard thereto was to survey and locate the roads, make maps and plats and place them on file, and receive the compensation for services fixed by the acts. It is impossible to tell how many farms with the valuable improvements upon them, and how many village and city lots upon which now stand costly buildings, might be affected by public highways which were staked off and located, and the surveys and plats

thereof filed, forty, fifty, sixty or more years ago, and such highways never opened by the local authorities or used by the public. A conclusion that the lands so staked off and platted, but never opened or used for public roads, continuously have been and are now public highways, and the structures and buildings thereon purprestures, and the owners and occupiers of the same but trespassers, would probably be a prolific source of injustice and wrong, and destructive of property rights and interests. We think the circuit court was right in the conclusion it reached, that a public road was never legally opened on the land in controversy.

We find no error in the record, and the judgment is affirmed.    *Judgment affirmed.*