# Felix M. Chmielewicz, Administrator, Appellee, v. Chi= cago Heights Terminal Transfer Railroad Company, Appellant.

## Gen. No. 16,140.

1. ESTOPPEL—*when arises to deny ownership.* A railroad company cannot deny ownership of land where it is asserting the existence of its rights by virtue of the very instruments which establish such own-ership.

2. DEDICATION—*what tends to establish.* Entering upon a street and improving the same shows an acknowledgment of a grant and an intention to avail thereof.

3. TRESPASSERS—*when person upon right of way not.* A person is not a trespasser upon the right of way of a railroad company if the evidence fails to establish that the railroad company had superior rights to the general public upon the place where its right of way was located.

4. NEGLIGENCE—*when method of switching constitutes.* *Held,* that whether under the circumstances of this case it was negligence to turn loose without means of control, a train or car on a public street, and with no one in front of this moving train to give warning, was a sub-ject to be decided by the jury.

Action in case for death caused by alleged wrongful act. Appeal from the City Court of Chicago Heights; the HON. HOMER ABBOTT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Affirmed. Opinion filed February 13, 1912.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; EDWARD W. EVERETT, of counsel.

. ROCKHOLD & BUSCH and LINDHOUT & LINDHOUT, for appellee; FRANK A. ROCKHOLD, of counsel.

MR. JUSTICE KAVANAGH delivered the opinion of the court.

A little after one o'clock on the afternoon of Sep-tember 23, 1908, Albert Pawlus, a Polish laborer, who was then about thirty-five years of age, was struck

and killed by the cars belonging to appellant on what is known as Seventeenth street in the city of Chicago Heights. After a verdict against appellant for five thousand dollars in the court below, appellee remitted one thousand dollars, and from a judgment for four thousand dollars appellant comes to this court, alleging many errors on the trial below.

The Railroad Company claims first, that deceased was a trespasser; that the right of way upon which its tracks were being operated was in the sole and exclusive possession of appellant, and while, as a matter of fact, the tracks were upon the premises known as Seventeenth street, the public had no right to either walk along or across these tracks, or, as we construe the language of the argument, to use any portion of the south 99 feet of that street.

It appears in evidence that in 1891 the owner of the land under consideration dedicated it to public use by proper plat and certificate, describing streets, alleys and all abutting lots and blocks. Down the center of this plat was a strip of land marked "Seventeenth street," 132 feet in width and immediately bounded, on either side by regularly numbered blocks, lots or parcels of land. On this plat, in the middle of Seventeenth street, ran a dotted line, above which was lettered in red ink, "Railway Rights Reserved on all Streets in this Subdivision South of Sixteenth Street in Section 21." This reservation included among other streets the street in question. No particular railway was designated, but at and before the time of the dedication appellant was in possession of one main track running down the length of the street, and of several switch tracks that crossed the street on either side. Under what right these tracks were first laid down, by what deed, contract, grant or other conveyance appellant held its interest, or as to the length, extent or nature of that interest, appellant has not seen fit to enlighten the court by proof. It has contented itself

with an effort to show that the public made no use of the south 99 feet of the street. In doing so, indeed, it has been also shown that while the city of Chicago Heights curbed, paved and otherwise improved the north 33 feet of this street, it never, at any time, made improvements on the rest of the street nor in any way disturbed such remaining portion. On the other hand neither did the city in any manner ever relinquish its right to the south 99 feet, but on the contrary, in November, 1909, passed an ordinance giving "permission and authority" to appellant to "lay down, construct, maintain and operate a railroad with one or more tracks and such switches, etc., as said company may deem necessary on and along Seventeenth street, except the north 33 feet of said street;" and while it is thus clear that the city never made use of the south side of Seventeenth street, it is equally clear that neither did the Railroad Company make use of said portion, except for the main track and for the crossing of said street with its switch tracks, to enter the factory grounds which lined the south side of the street. It is manifest that the original dedication to the public was of the entire 132 feet in width, subject to any rights which the Railroad Company might have had at the time of the dedication.

The appellant contends that this right reserved was to the exclusive use of the south 99 feet of the street. An exclusive use of two-thirds of the street seems to us, however, utterly inconsistent with an idea of the dedication of the entire 132 feet to the public. Futhermore, in this dedication, as we have seen, lots of ground were laid out on the south side of the street, which could not be reached in the ordinary course without crossing the tracks in question.

Now it must be assumed, for the purpose in this case, that the dedicator at the time of the dedication owned the land upon which the tracks lay. The certificate itself is evidence of that fact. The quiescence of

the world in his assertion of title tends to show that, and appellant cannot deny his ownership, because in the case at bar it is asserting the existence of its rights, through the reservation in this very grant. What, then, must have been the intention of the owner of this land at the time of making his grant to the public? To create a street, which no one might cross, with buildings on each side? And this too, with many other streets dedicated by the same instrument leading up into it, and ending in front of these factory sites? To us such construction placed upon the grant would be inconsistent and unwarranted. The city was not obliged, within any given time, to pave or improve the entire width of the street, in order to show its acceptance of the dedication. Its entering upon the street in question and improvement of such portion as at the time suited the general need, so far from resulting in the relinquishment of the remaining portion of Seventeenth street, showed an acknowledgment of the grant and an intention to take advantage of it.

In the case of Fairbury v. Agricultural Board, 169 Ill. 9, the Supreme Court said: "The appeal concerns only the portion obstructed by appellant, and in its behalf it is argued that there is only an acceptance of those parts of the alley where work was done, putting in culvert and tile, and filling the road, which was on another part. The road was a single, direct street, and the public could not be required to make repairs where not needed, for the purpose of accepting the whole. The acceptance cannot be confined to the particular spots where the work was done, and the public be deprived of the remainder." To the same effect is the decision in McDonald v. Stark, 176 Ill. 456. In the case of the City v. Tichenor, 179 Ill. 97, the court says: "Unless, there is something to show that the acceptance was limited, and some part of the offered land was rejected, it should be deemed as an accept-

ance of the whole as offered.'' Augusta v. Tyner, 197 Ill. 242; Waugh v. Leech, 28 Ill. 288.

But suppose the evidence fails to show title to this portion of the land in the city, in what manner is appellant relieved from liability under the circumstances of this case? Deceased was a trespasser only in case the Railroad Company had as against him the exclusive use of the land covered by its tracks. As we have said, there is no affirmative direct evidence of the existence of such right, and the circumstances that on the south side of Seventeenth street was situated a line of factories employing hundreds of men, and on the north side was a line of dwellings and little business houses, and that it was necessary for the full enjoyment and use of these factories and houses that the occupants might be able to cross the street, and that this could not be done without crossing the railroad tracks, tend strongly against the claim of appellant. Suppose the city failed to accept the dedication of the street through its full width as contended, even this would not deprive the street of its public character through said entire width, according to the terms of the dedication; for, as was said in the case of Earll v. The City of Chicago, 136 Ill. 277, 285: ''If the owner of land exhibits a map or plan of a town or addition platted thereon, and on which a street is defined, and sells lots abutting on said street, and with a clear reference to the plat exhibited, then the purchasers of such lots have a right to have that street remain open forever. And such right is not a mere right that the purchaser shall use the street, *but it is a right vesting in the purchaser that all persons may use it*; * * * that the public street indicated on the plat shall be open forever to the use of the public as a public highway.'' In Zearing v. Raber, 74 Ill. 409, it was said, ''It is unimportant whether the public have so far accepted the dedication as to be bound to keep the street in repair, since the question involved is simply one of private right.'' And it was

there held that abutting lot owners were unaffected in their right to have a dedicated highway kept open by any waiver on the part of the municipality. So in this case, if the entire 132 feet were originally dedicated as a street, the public, its claim flowing through the vested right of the abutting lot owners, was justified in treating the street in question as a public highway through its entire width, irrespective of any waiver on the part of the city of Chicago Heights. It is claimed that appellant paid taxes upon the street in question. Conceding this to be true, such a fact is far from conclusive as to appellant's right. Concerning the payment of taxes in cases of this character, the Supreme Court in Ottawa v. Yentzer, 160 Ill. 509, says: "It is, however, under most circumstances a matter of but small probative force, and if the land in fact is dedicated to the public as a highway, the fact that it has been taxed will not prevent the public from claiming the use of such land as a public road." See, also, North Chillicothe v. Barr, 185 Ill. 322.

We are unable therefore to agree with appellant that as a matter of law it has been proven that the Railroad Company had any right in the street superior to the rights of the general public, and we therefore conclude that the court below would not have been justified in assuming, as a matter of law, that the deceased at the time of the accident was a trespasser.

At a point on the track just opposite the line of a street called Shields avenue which runs into this Seventeenth Street, and on the south side of the railroad track, a switch is located from which, in a broad curve, a side track swung toward the south and east, extending across the street and into the factory property on the south side of the street. About 137 feet east further along this main track, and on the opposite side from the first switch, was another switch controlling another side track that curved in an opposite direction from the first; that is, it curved away from the north

side of the track toward the north and west and across the narrow paved portion of the street. In other words, these tracks ran away from each other in opposite directions; one on the south side of the main track and extending to the south and east, and the other on the north side of the main track extending to the north and west. Upon this curved switch track extending to the south and east, at the time of the accident, it happened that a "string of box cars" stood, shutting off objects on the main track from the view of any one who happened to be approaching Shields avenue from the south. While matters were thus situated a switching crew of appellant was engaged in shifting cars about on the main track. The engine had just pushed eight or nine cars up a slight declivity toward the east, and then detaching itself, ran back, passing through the first switch, turning onto the north switch track to let the detached cars come on down the track and pass the switch. The engine stopped on the said track about opposite Shields avenue, and nearly alongside the first switch, which held this long curved line of standing cars that stretched to the south and east. Meantime, the eight or nine cars which had been thus pushed east up the main track begun of their own momentum to return west, down the main track; in other words the crew was making what is known as a flying switch. Now these cars thus descending would be in plain view of any one approaching the track from the north, but probably would be concealed by this line of standing freight cars from any one approaching the track from the south. All the time these cars were moving, the engine stood by the first switch, its bell ringing and some steam escaping.

There is a conflict in the testimony concerning the make up of the train of cars which was being switched. However, it is conceded that the first car was a gondola or flat car, loaded probably with sand, and that

no one was upon that car. Certain witnesses say no one was upon either of these moving cars. Others say the witness Schroeder was upon one of the cars, but disagree as to which one of the cars he was located upon. Schroder himself testifies that as the cars came down, he was sitting upon the rear end of the second car; that he was facing north, his legs hanging over. Concerning this manner of switching cars, it was said by the Supreme Court of this state, in I. C. R. R. Co. v. Hammer, 72 Ill. 347:

"On the other hand all know that a flying switch, passing on a track without an engine attached, or a bell ringing, or a whistle sounding, is and must, from the very nature of things, be more dangerous to life than a switch with engine attached, with the usual signals being sounded. The object of having a bell rung or a whistle sounded at road crossings and places where there is danger of collisions is wholly defeated by the use of this mode of switching, and, when employed, it necessarily implies negligence on the part of the company."

Again in the case of C. R. I. & P. Ry. Co. v. Dignan, 56 Ill. 487, the court says:

"We have no doubt as to the negligence of the defendants. Every person who has had frequent occasion to visit the grounds of a railway company where freight trains are made up, must have observed how noiselessly one or two empty freight cars will move along the track after having been uncoupled from the locomotive or from the main body of the train, and what a distance they will pass over by their own momentum. That it is negligence to set a car or a couple of cars in motion, and, after giving them a momentum that will carry them onward at the rate of three or four miles an hour, to disconnect them of all controlling power, and allow them to move along where workmen are engaged, with their attention absorbed by their employment, and where persons are constantly passing

to and fro, with no one on the cars to apply a brake or sound an alarm—that this, we say, is negligence, is a proposition which cannot well be denied. The sense of hearing alone will give warning of the approach of an ordinary train, but one of these cars, thus set in motion, gives to the ear no token of its approach, and it is undoubtedly true that many a life has been de- stroyed, and many a limb crushed, by agencies sub- stantially like those disclosed by this record. The plaintiff offered in evidence various rules of the com- pany, one of which expressly forbids what are called 'flying switches.' The mode of switching adopted in the present case, it appears by the evidence, was not what is technically called a 'flying switch,' but it seems to us to possess substantially the same elements of danger. In this case, as in the flying switch, cars are left to pursue their own way along the rail, with no person to control or check their course or to give warn- ing of their approach, and with a speed which, though slow, is the more noiseless for being slow, and is still sufficient to prostrate whatever persons the cars may strike.''

So we also conclude that, whether under the circum- stances of the present case it was negligence to turn loose without means of control a train of cars on a public street, and with no one in front of this mov- ing train to give warning, was clearly a subject to be decided by the jury.

Upon the objection that Pawlus was himself guilty of contributory negligence, there is a sharp conflict in the testimony. If, as we have shown, deceased ap- proached from the south, these moving cars might easily have been hidden from his sight until he was within a few feet of the track, and then directly in front of him stood the engine, ringing its bell and seemingly ready to start moving,—circumstance well calculated to divert and absorb for the moment the attention of one about to pass. In such case the trial

court would not have been justified in passing upon the question as a matter of law. If, however, Pawlus approached the tracks from the north, there would have been no obstruction of his view and little excuse for his going upon the track in front of the train in question. Five witnesses, seemingly disinterested, testified to facts proving that Pawlus approached from the south. The evidence of seven witnesses, on the other hand, tend to show that he came from the north side of the street. The decision on that question depended altogether upon the credit that should be accorded the different witnesses. The matter of the credibility of witnesses, whenever a subject for this court, is only so under extraordinary circumstances, and never in a case like the present, and upon this, as upon the question of appellant's negligence we have no right to interfere with the verdict.

The amount of the verdict in this case is also controlled by the decision of the jury. Pawlus left surviving him a mother, to whom he monthly sent remittances, and also a sister. It cannot be said, as a matter of law, that the life of a son, who might be depended upon in an emergency, and who was a constant help, was of pecuniary worth, to a mother and to his estate, less than $4,000.

We have examined with care the other objections to the instructions and to the rejection of evidence, and we find no substantial error in the record. The judgment will therefore be affirmed.

*Judgment affirmed.*