# THE CITY OF CHICAGO *et al.*

### *v.*

## TIMOTHY WRIGHT.

1. MUNICIPAL CORPORATION—*title and control of streets.* The corporate authorities of a city hold the public streets in trust for the use of the public. Where the municipality possesses the fee in such streets, although in trust for public uses, it may maintain ejectment against any one who wrongfully intrudes upon, or occupies, or detains the property. Where the adjoining proprietor retains the fee, the right to the possession, use and control of the street by the municipality is regarded as a legal, and not a mere equitable right.

2. INJUNCTION—*to prevent city from interfering with the closing up of a street.* Where a strip of ground had been occupied and used as a public street for many years, and was claimed as such by the city authorities, who were in possession of the same and exercising control over it, it was *held*, a decree, on bill filed by the original proprietor, enjoining the city and the city police from interfering with the complainant and preventing him from shutting up the same and appropriating the ground to his individual use, and thus enabling him to take forcible possession, was clearly erroneous.

3. CHANCERY—*will never aid in the commission of an unlawful act.* A court of equity will never exercise its preventive powers to aid a party in doing an illegal act. Where one party is in possession of real property, and the other party claiming the same is out of possession, the court will not enjoin the former from any action, so as to enable the latter to take forcible possession.

4. SAME—*interference with the exercise of police powers.* A court of equity has no power to enjoin the exercise of the police powers given by law to the officers of a municipal corporation, so as to prevent such officers from preserving the public peace, and from keeping a public street open to public use. The court has no jurisdiction to interfere with the public duties of any of the departments of the government, or override the policy of the State.

5. SAME—*interfering with the exercise of the right of eminent domain.* Where a court of equity, by decree, stayed the hands of the corporate authorities of a city and the police power, to enable a party to take forcible possession of a public street, and provided that after he had closed up the same the city should be forever enjoined from opening or attempting to open the same, for public use, it was *held* to be an unwarrantable attempt to interfere with the exercise of the right of eminent

domain, on the part of the city, which was a political question of expediency, and not a judicial one.

6. STREET—*right by prescription.* Where a strip of land has been thrown open for public use, and has been used by the public as a street in a city for over twenty years, the public will have a right to the same by prescription.

7. SAME—*estoppel to deny that land is a public street.* Where a party fences off a strip of land, the same as if it were a public street, and sells lots with reference to it, and stands by and sees others build with reference to such street, and permits the ground to be so used until both public and private rights would be materially affected by a denial of such enjoyment, it seems that he will be estopped from afterwards claiming the land for his private use, or denying its dedication to the public.

8. SAME—*dedication is a question depending upon intention.* No specific length of possession by the public is necessary to constitute a valid dedication of ground as a street. All that is required is the assent of the owner of the soil to the public use, and the actual enjoyment by the public of the use for such length of time, that the public accommodation and private rights acquired on the faith of it would be materially injured by a denial or interruption of the enjoyment. But the question of a valid dedication, as between the owner and the public, generally depends upon the intention of the owner to devote the soil to public use, and the acceptance by the public.

9. DEDICATION—*acts not concluding the public from insisting on.* If land is in fact dedicated to the public for a street, and accepted, the fact that the land is taxed, and the fact of instituting proceedings to condemn the land, which are never consummated, will not conclude the public from claiming the use of the land for a public street.

10. CHANCERY — *bills of peace as against public rights.* Courts of equity will not, upon a bill in the nature of a bill of peace, decree a perpetual injunction for the establishment, or the enjoyment of the right of a party who claims in contradiction of a public right, as, if he claims an exclusive right to a highway, or to a navigable river, etc.

APPEAL from the Circuit Court of Cook county.

Mr. M. F. TULEY, Corporation Counsel, for the appellants.

Messrs. SHOREY & NORTON, for the appellee.

Mr. JUSTICE McALLISTER delivered the opinion of the Court :

This was a bill in equity, filed June 24, 1872, in the Cook circuit court, by Timothy Wright, against the city of Chicago

320          CITY OF CHICAGO *et al. v.* WRIGHT.     [Sept. T.

Opinion of the Court.

and Mancel Talcott, as chief of the police of said city, for an injunction.

It appears in substance, by the bill and plat annexed, that Washington and Madison streets are east and west streets of said city; that for a long time before, on, and ever since June 26, 1854, Wright was and still is seized in fee of certain lots comprising a block in said city, lying between said streets, bounded on the west by Ada street, and on the east by what is known as Elizabeth street; also, of a certain strip of land, fifty-one feet wide, corresponding in length with the width of said block, and being upon the east end thereof; that this strip comprises the whole space of what is known as Elizabeth street, between and connecting with Washington and Madison streets, excepting a narrow strip along the east line or side of Elizabeth street, being about fourteen feet wide, running from Washington to Madison street, and covered, or nearly so, by a sidewalk; that on said east side of Elizabeth street, property owners have constructed buildings, abutting on the east line of said street. By the bill, Wright alleges that he has never conveyed said first mentioned strip to the city, or dedicated it to public use. He claims that he is entitled to the possession of said strip, and that, at various times, he has attempted to take possession of it, and fence it up, but has been prevented by the city authorities and police from so doing. The bill prays for an injunction, enjoining the city of Chicago, and Talcott, as chief of the police thereof, their attorneys, solicitors, agents and servants, from going upon this first mentioned strip of land; from opening, or causing it to be opened or kept open for public use; from tearing down, injuring or in any way interfering with the fence on said land; or preventing Wright, his agents, etc., from restoring said fences and inclosing said strip of land.

A temporary injunction was issued, by order of the court, pursuant to said prayer. An answer was filed by defendants, putting in issue the material allegations of the bill; and, on

replication, the cause was heard upon pleadings and proof, and a decree passed making said injunction perpetual. From that decree defendants appealed to this court, assigning error in the rendition thereof.

It appears, by uncontradicted testimony, that in 1855 the strip in controversy was thrown open to public use, by the construction of a fence along the west line thereof, between Washington and Madison streets, and the planting of trees on a line parallel with the fence and about ten feet east therefrom, indicating a space between the trees and fence for a sidewalk; that the strip in question, and the other, being about fourteen feet wide, constituted, at that time, an apparent street of about sixty-six feet in width; that such apparent street then, and ever since, had a road bed, was used by the public as a street, and extended north to Randolph street; and the witness, who was Wolcott, county surveyor, an old resident of the city, and in 1855 employed to survey certain premises near this locality, testifies, that the trees which had been planted appeared, at that time, to have been set out there some four or five years, and he was quite sure that the land thus thrown open had been used by the public as a street four or five years before that time—the east side was being built upon. This evidence was wholly uncontradicted, and tends strongly to show that the land in question had been thrown open to the public, and used by the public, for the purposes of a street, for more than twenty years before the commencement of this suit.

Then witness Witbeck, whose testimony is, in no respect, controverted, shows that the land in question had comprised a part of Elizabeth street, and was known by him to have been used by the public, as a street, for at least fifteen years; corroborates Wolcott as to the fence and trees along the west side. He further testifies, that in August, 1860, he purchased of Wright the lot on the north-west corner of Washington and Elizabeth streets, for the purpose of a residence, while the street was so open and in use by the public; that

21—69TH ILL.

Wright exacted of witness a bond, in the penalty of $1000, conditioned that witness would erect a house on the lot purchased, to cost not less than a specified amount; that during the negotiations Wright represented to witness that Elizabeth, between Washington and Madison streets, was a street, and should never be closed. The witness built a house on this lot, for a residence.

It appears that Wright has been out of the possession of the land in question the whole time since it was first thrown open for public use, except that, in 1868, he took forcible possession and fenced up the street by running a fence across each end at Washington and Madison streets east to the sidewalk on the east side of Elizabeth, and then put a fence along the east line thereof from Washington to Madison, thus excluding the property owners, who had built on the east side, from all ingress or egress except such as was afforded by this sidewalk in front of their property. This was probably regarded as a nuisance by the city authorities and persons accustomed to use the street, and the fences were soon removed; since which, Wright has been *out of*, and the city *in*, possession for the use of the public; so that, at the time of commencing this suit, the city was in peaceable possession of this land for public use.

That the city, in legal contemplation, was in possession, must follow from the doctrine of the courts respecting the right of a municipal corporation, to which the law gives the general possession and control of the streets, etc., to recover the same in an action of ejectment. Where the corporation possesses the fee, although in trust for public uses, there are no technical obstacles in the way of maintaining such action against any one who may wrongfully intrude upon or occupy or detain the property. But where the adjoining proprietor retains the fee, the courts seem to have overcome the difficulty by regarding the right to the possession, use and control of the property by the municipality, as a legal and not a mere

equitable right.   Dillon on Mun. Corp. sec. 523, and cases cited in notes.

By the charter of Chicago, the possession and control of the streets, for public use, is given to the municipality.   (Gary's Laws, Ch. 4, p. 22, *et seq.*)   The complainant shows, by testimony given on his behalf, that, in 1863 or 1864, he attempted to take possession of this land by force, and, by the direct action of the city authorities, he was prevented, thus showing that the city assumed to have the possession and control of this as a street.   The city having, by law, the capacity to take possession and control of all the streets within it, for public use, and having assumed possession and control of the one in question, which had been so thrown open for, and been so long in, public use, we must regard the municipality as having, in fact, the possession at the time of filing the bill.

There is no allegation in the bill that the city was about to dig up the soil, or do any act which would constitute an irreparable injury to the estate.   What, then, is the precise nature of this case?   The city is in peaceable possession. and Wright, being out of and desirous of obtaining possession without recourse to any action of ejectment, or other action by which the rights of the parties could be determined at law, seeks to obtain possession by his own mere act, against the will of the occupant, by taking the law into his own hands, and asks a court of equity to tie the hands of the city authorities, including the police power, while he may thus make entry upon this land in use as a public street, eject the public and take possession himself, without even proposing to limit himself as to the manner of doing it.

The decree of the court below finds nothing as to the question of dedication, or prescription; purports to confer upon complainant no legal authority, but speaks only in the language of injunction.   It says, in effect, to the city of Chicago, the chief of police, their attorneys, solicitors and agents: "Hands off, all of you, and let the complainant, his agents, etc., enter upon and fence up this strip of land heretofore

used as a public street, in such manner as to him or them may seem fit and proper; and when he shall have so entered, see to it, under the pains and penalties of conviction for contempt of this court, that you, none of you, take any steps to open or keep the same open for a street."

As to the propriety of equity interfering between individuals to eject the defendant and put the plaintiff in possession of real estate, as an original proceeding, see *Deere* v. *Guest,* 1 Myl. & Cr. 522; Addison on Torts, 315, 316.

The particular objections to this decree are: (1.) It is the exercise of the preventive powers of the court of equity to aid complainant in doing an illegal act—in committing a trespass, and one tending to a breach of the public peace. (2.) It is an unwarrantable interference with the police power of the State. (3.) It apparently assumes to control the discretionary political power of the city of Chicago in reference to the exercise of the right of eminent domain.

First, then, as to the nature of the act contemplated, to the doing of which the aid of the court has been extended. The complainant is *out* of, and the city *in,* possession. The former wants to enter upon the land and fence it. He simply wants to be let alone while doing so. But, without any reference to whether he is lawfully entitled to the possession or not, the statute of forcible entry and detainer prohibits the doing the act contemplated, because every entry upon land against the will of the occupant, by the settled law of this State, amounts to a forcible entry, and if done by menaces, force and arms, by the common law, amounts to an offense against the public peace.

In *Reeder et al.* v. *Purdy,* 41 Ill. 279, this court expressly decided, upon full argument and careful consideration, that the statute of forcible entry and detainer, by necessary construction, forbids a forcible entry, even by the owner, upon the actual possession of another. Such entry, the court say, is therefore unlawful. If unlawful, it is a trespass, and an action for trespass must necessarily lie.

Courts of equity will, under certain circumstances, intervene to *prevent* the commission of a trespass upon land, but we have yet to learn that they ever interfere *to aid* a party in committing one.

Secondly, as to the propriety of enjoining the police power for the purpose of enabling complainant to make forcible entry upon this land, there is not only no principle upon which this phase of the decree can be sanctioned, but it is positively dangerous to the peace and security of society.

In the case of *Reeder et al.* v. *Purdy, supra*, the court say: "If the right to use force be once admitted, it must necessarily follow, as a logical sequence, that so much may be used as shall be necessary to overcome resistance, even to the taking of human life. The wisdom of confining men to peaceful remedies for the recovery of a lost possession, is well expressed by Blackstone, book 4, p. 148: 'An eighth offense,' he says, 'against the public peace, is that of a forcible entry and detainer, which is committed by violently taking or keeping possession of lands and tenements with menaces, force and arms, and without authority of law.' This was formerly allowable to every person disseized, or turned out of possession, unless his entry was taken away or barred by his own neglect or other circumstances, which were explained more at length in a former book. But this being found very prejudicial to the public peace, it was thought necessary, by several statutes, to restrain all persons from the use of such violent methods even of doing themselves justice, and much more if they have no justice in their claim. So that the entry now allowed by law is a peaceable one; that forbidden is such as is carried on with force, violence and unusual weapons," and the court proceeds: "In this State it has been constantly held that an entry is forcible, within the meaning of this law, that is made against the will of the occupant." *Croff* v. *Ballinger*, 18 Ill. 200.

Complainant proposed no limit to the mode, or manner, or means, to be used in making the entry; nor did the court

326 CITY OF CHICAGO *et al. v.* WRIGHT. [Sept. T.

Opinion of the Court.

impose any restraint upon him in this respect. The injunction against the chief of police might be regarded as operative, even if the entry should be made with violence and unusual weapons, constituting an offense against the public peace, and, if so, it is an attempt to override the policy of the State in the repression of all forcible entries, because they naturally tend to a disturbance of the public peace.

Was it ever before heard of, that it was within the province of a court of equity to overrule the policy of the State, manifested by a statute passed with reference to the public peace and security, and thus shackle the hands of State officers whose functions relate to the preservation of that peace and security? The heads of the police department of Chicago are not mere municipal officers, whose functions relate exclusively to that particular municipality, but they are State officers—that is, officers whose duties concern the State at large, or the general public, although exercised within defined territorial limits. The administration of justice, the preservation of the public peace, and the like, although confided to local agencies, are essentially matters of public concern. Dillon on Municipal Corp. sec. 33.

"As a political society, the State has an interest in the repression of disorder and the maintenance of peace and security in every locality within its limits." Mr. Justice DENIO, in *People* v. *Draper*, 15 N. Y. 543.

The court of chancery is conversant only with questions of property and the *maintenance* of civil rights. It has no jurisdiction to interfere to aid a party in the violation of a public law, to overrule the policy of the State, or interfere with the public duties of any of the departments of government.

Lastly. The decree apparently goes to the extent of restraining the city of Chicago in the exercise of the right of eminent domain. It, at least, would admit of that construction. This is, in reality, a most extraordinary proceeding. It stays the hands of the corporate authorities and police power,

while complainant makes an entry by force and in violation of a public law, and then, when he thus obtains possession, it attempts to secure it in him by restraining the city from even the exercise of the right of eminent domain as to this strip of land, for the injunction is against opening or causing the same to be opened or kept open for public use. The question of the necessity or expediency of the exercise of this right is essentially political in its nature, and not judicial. Dillon on Corp. sec. 465.

And there is a further objection to this proceeding to enable complainant to get into possession without resort to proceedings at law. Upon the evidence in this case, his right as against the public, is doubtful. The city has possession for the use of the public. The right of use is not limited *exclusively* to the citizens of Chicago, but the citizens of the State generally have an *equal* right with them in the appropriate enjoyment of the dedication. This was so held in *City of Alton* v. *Transportation Co.* 12 Ill. 60, and is a proposition that none can gainsay.

The Attorney General was not a party, and the court assumed to foreclose the whole matter when the people were not represented.

If the land in question had been thrown open for public use, as above stated, and used by the public as a street for twenty years before this suit was brought, that would establish the public right by prescription.

The qualification to dedication as to 33 feet of this strip, as manifested by the plat, is not, of itself, conclusive. The owner might so act and make such use of the land as would, nevertheless, amount to a binding dedication by estoppel *in pais*, as, by adding to that 33 feet another strip on the west of it 18 feet wide, building a permanent fence along the west line of the last mentioned strip, and planting trees, as above stated, thus indicating an intention to devote the whole 51 feet, in connection with the strip 14 feet wide, thrown open by property owners on the east side, to the purposes of a street,

then standing by and letting owners of property abutting on the east side, and others like Witbeck, become interested in the street being kept open, by building upon it, and permitting it to be used by the public until both public and private rights would be materially affected by a denial of such enjoyment.

The established rule of law on this subject, when properly formulated, is this: "No specific length of possession is necessary to constitute a valid dedication. All that is required is the assent of the owner of the soil to the public use, and the actual enjoyment by the public of the use for such a length of time that the public accommodation and private rights would be materially affected by a denial or interruption of the enjoyment." Dillon on Corp. sec. 494; 2 Greenlf. Ev. sec. 662; *Smith* v. *Town of Flora*, 64 Ill. 93.

The question, however, of a valid' dedication as between appellee and the public, apart from all considerations arising from the doctrine of estoppel *in pais*, as between him and the owners of abutting property, would necessarily involve the intention to dedicate on the part of appellee and acceptance by the public.

Because the citizens of the State generally have an equal right with those of Chicago in the appropriate enjoyment of the dedication, the several acts by the corporate authorities of Chicago, relied upon by counsel for appellee, can not be regarded as amounting to a conclusive negative of the inference of acceptance by the public.

In *Lemon* v. *Hayden,* 13 Wisc. 159, it was held, the inference of acceptance by the public is not negatived by the fact that the land used for a street had been taxed for city and county purposes. See, also, *Wyman* v. *State,* ib. 663.

The same may be said of the fact of the institution, on behalf of the city, of proceedings to condemn these lands, but which were never consummated. So of the reports of committees of the common council; the general public could not be concluded by them. We do not profess to decide

whether there was or was not a valid dedication, or right in the public by prescription. It is enough that the right of the complainant is not clear, and the question should be determined at law.

In speaking of bills of peace, Story says: It seems that courts of equity will not, upon a bill of this nature, decree a perpetual injunction for the establishment, or the enjoyment of the right of a party who claims in contradiction to a public right, as, if he claims an exclusive right to a highway, or to a common or navigable river, etc., for it is said this would be to enjoin all the people of the State or country. But the true principle is, that courts of equity will not, in such cases, upon principles of public policy, intercept the assertion of public rights. 2 Story's Eq. Jur. sec. 858.

The decree of the court below will be reversed and the bill dismissed.

*Decree reversed.*