(Franklin Co., O., Common Pleas Court.)

J. F. FERGUS v. THE CITY OF CO-LUMBUS.

---

(1). The tax-payer's action, authorized by sections 1777, and 1778, of the Revised Statutes, can not be prosecuted to gratify caprice or the secret purpose of the plain-tiff or of third persons.

(2). The plaintiff is not obliged to show a substantial injury; proof of a meditated illegal act is enough.

(3). The objects of these sections of the statutes defined.

(4). The contract awarded to a foreign corporation by the director of public im-provements of Columbus is not invalid-ated by reason of a non-compliance by the corporation with the requirements of the statute passed April 25, 1893, entitled "an act to regulate foreign stock corporations, other than money, by requiring such cor-porations to procure a certificate from the secretary of state, etc."

(5). The federal plan of municipal government in force in Columbus makes a definite separation of the legislative and executive powers of government.

(6). Under that plan the city council can not lawfully make contracts; it only authorizes said council to carry them out by appropriating the money.

(7). The statute which created this plan does not enumerate all of the powers and duties of said director; many of them are the same as those which are vested in, and required of trustees of water-works, trustees of cemeteries, park commission-ers and civil enigneers in cities of the first grade of the second class.

(8). In determining which of several bidders for furnishing pumping machinery was the lowest bidder. within the mean-ing of section 2419, of the Revised Statutes, or which was the lowest responsible bid-der within the meaning of the charter law of said city, it was competent for the director to exercise discretion.

(9). The adoption of a resolution by the said council, such as is required by section 2304, of the Revised Statutes, was not necessary to validate the contract in controversy in this case.

(10). The so called Burns law has no application to the said contract.

---

PUGH, J.

This is a taxpayer's action,—an ac-

tion authorized by sections 1777 and 1778, of the Revised Statutes. These statutes permit a taxpayer, who observes a misapplication of the funds of the city, of which he is a taxpayer, or the abuse of its corporate powers, or the execution or performance of any contract made in its behalf, which contravenes any law or ordinance, to appeal to court for an injunction restraining such acts, the city solicitor having declined to bring the suit. This right of action is similar to the right of action which the stockholders of a private corporation possess without the aid of a statute. 20 Abbott's New Cases, 431.

The plaintiff in such an action as this, is entitled to relief when he has made out a case within the statute, although it may not satisfy the principles and rules of equity jurisprudence and procedure.

Before this statute was enacted, a taxpayer had no remedy for the preservation of municipal property.

The duty of courts is to construe the statute with liberality that the remedy may be advanced, as it is in the construction of all statutes, passed to prevent wrongs and frauds.

Every pecuniary interest and right of the municipality, which could be misapplied or misappropriated by the unauthorized or wrongful act of municipal public servants or agents to the loss or wrongful injury of the municipality, or taxpayer, is included within the scope of these statutes. Its words "embrace not only property and funds in possession, but the credit and power of taxation and borrowing money, in anticipation of taxation," and also every process and means by which the municipality can be charged pecuniarily or the taxable property within its limits burdened." Ayers v. Lawrence, 59 N. Y., 192.

To enable the plaintiff to maintain the action, is he obliged to show any substantial injury to the municipality? Or to any taxpayer? Will it not suffice if he proves a mediated, a threatened illegal official act? Warren v. Baldwin, 103 N. Y., 34.

These statutes can not be used to subserve a mere private, secret, purpose of the person who brings the suit, or of any third person. To illustrate, when the bone of contention is touching a contract awarded by the municipal corporation to one of several competitors, a suit prosecuted nominally by a taxpayer, but in reality to help a disappointed competitor for the contract, would be a gross abuse of the rights conferred by the statute, and courts will refuse to exercise the jurisdiction when that fact is shown. Hall v. Ely, 2 Abb. (N. C.), 440.

Under a statute exactly similar to ours, but more comprehensive, a court refused to issue an injunction against the sale of a ferry franchise, because it appeared that the real parties in interest as plaintiff, were the persons who were then exercising the franchise, and because the object of the suit was to protect themselves in the enjoyment of the right. See Lutes v. Briggs, 64 N. Y., 404.

There is manifest good sense and wisdom in giving this construction to the statutes of this state, because the remedy of mandamus is accorded to the bidder who is wrongfully deprived of the contract.

Again, it may be said, by way of illustration, that a suit prosecuted merely to gratify the caprice or personal spite of some person, or to have the court settle some mooted question of power in which some one's pride or obstinacy is interested, would not be authorized by the statute. I do not intend to intimate that this suit belongs to either of these classes, but I have heard of cases like them, and I simply use that knowledge to illustrate what my construction of the statute is.

The statute does not prescribe who shall be defendants in this sort of action; the ordinary rules as to parties dominate this question. Therefore, it is hardly necessary to say that all persons and corporations who may be directly effected by the judgment or decree that may be rendered are essential, indispensable, parties to a complete determination of the controversy. Is not the Holly Company an indispensable party to this suit?

Osterhaudt v. Supervisors of Ulster, 98 N. J., 239.

There is another preliminary observation touching the purpose of the statute that is pertinent.

From all officers of a municipal corporation, the law expects and exacts the same degree of fidelity, care and caution, as would be expected from an individual, in regard to his private affairs. The failure of municipal officers to observe this requirement, was probably the inspiration of the statute's enactment. The obligations imposed upon such officers, were found to be insufficient to keep down expenditures and burdens, and to secure from them a complete and careful discharge of their duties. To accomplish this end, they were, by this statute, subjected to the restraint and oversight of the taxpayers. If a contract or purchase is made by such an officer, he is required to employ the same diligence, skill, wisdom and fidelity, that would be expected, if he was making a contract or purchase for himself. Therefore, it is, that for a mere error of judgment, involving no greater difference, than might reasonably exist between persons purchasing property for themselves, a court of equity would not interfere and restrain the purchase.

On December 4th, 1893, the city council, by ordinance, ordered that there should be purchased for use at the West Side Pumping Station, new pumping machinery according to plans, drawings and specifications on file in division No. 1 of the department of public improvements, or according to plans and specifications to be fully set forth in the bid therefor" and that the director of that department be authorized to advertise for bids, according to law. It was ordained that the entire cost and expense for the pumping machinery should be paid from the water works fund of said city, provided the same shall not exceed $125,000.00 the estimated cost thereof".

Further, the ordinance requires all bids to be submitted to the council for approval. Sealed proposals were advertised for, for the length of time

prescribed by any of the laws which may be applicable.

Three bids were made; one by the Holly Company at $103.000; one by the Blake Company at $100,000.00; one by the Allis Company at $91,000.00.

The bid of the Holly Company was accepted by the board of public works, and the directors of public improvements, enter into a written contract with that company, it agreeing to furnish the pumping machinery, deliver and set it up in its place.

The advertisements, in obedience to the ordinance, required each bid to be accompanied by plans and specifications for the foundation.

The evidence failed to show any other but the Holly Company complying with that requirement.

The competency and validity of the contract is assailed upon several grounds.

I will endeavor to discuss all of them, and the able arguments and briefs of counsel have lightened that labor very much.

It was very earnestly urged that this contract contravened the law; because, the Holly Company, confessedly a foreign or non-resident stock corporation, had not before the contract was made, complied with the exactions of the statute, passed April 25th, 1893. That statute declares that such a corporation shall not do business in this state until it first procure a certificate from the secretary of state, certifying that it has complied with all of the requirements of the law to authorize it to do business, in this state, and that its business is such as may be lawfully carried on by a corporation in this state.

The Holly Company did not comply with this statute before, but has since, the contract was made.

The contention was that this failure, makes the contract unlawful and void, and a decision of the supreme court of Tennessee, construing a cognate statute, was confidently appealed to as supporting the contention. This is not a new question, nor is the decision of that case the first one that has been rendered. The question, in age, has reached its teens and numerous

decisions have been rendered, interpreting similar or analagous statutes.

Scientifically, the statutes are divided into two classes: (1) Those which are merely disabling, and (2) those which denounce penalties for non-observance of their provisions.

The decisions of the highest courts are in discord in relation to the effect of the non-observance of such statutes by foreign corporations; but, if this classification is allowed to be the guide, the task of interpretation is made less difficult, it not easy.

The time is too short to consider all the features and bearings of these statutes, and I shall only comment on those which relate to this case.

The statutes of the first class do not make the contract of foreign corporations, made before the statute is obeyed, void or even voidable; they only suspend the right of the corporation to enforce the corporation by any remedy, until the statute's provisions are complied with.

By the statutes of the second class, all of a foreign corporations' contract are invalidated and rendered unenforcible by the corporation.

Since I began the preparation of this opinion, I have discovered, that there is a third class of authorities which hold that the only remedy is one in behalf of the state; that foreign corporations which do not comply with the provisions of a law, like our statute, usurp power; and the only remedy is by the state against the corporation.

Whether a statute, which merely prohibits the corporation from making any contract, but prescribes no penalty, belongs to the first or second class, is a question on which there has been some contrariety among the appellate courts.

The Ohio statute properly belongs to the first class: the Tennessee statute to the second class.

In all that is pertinent to the case, the Indiana statute of 1852, is just exactly like ours, and since it has been construed by the Indiana supreme court, its adjudged meaning will be instructive.

In our statute, there are only two provisions relative to the contracts of foreign corporations. "No such corporation now doing business in this state, shall do business herein, after July 31st, 1893, without having procured such certificate from the secretary of state; but any lawful contract previously made by such corporation may be performed and enforced within the state subsequent to such date". This is one provision.

It is obvious that this does not effect the contract in question in this case.

This is the other provision; "No such foreign stock corporation doing business in this state, without such certificates, shall maintain any action in this state upon any contract made by it in this state, until it shall have procured such certificate."

The first quoted provision embraced all contracts made before July 31st, 1893; the second, all contracts made after that day.

The contract in this case is governed by the second provision. An analysis of it shows, that it cannot, by any rule of construction, known to laymen, lawyers, or judges, be tortured into meaning that the contract is void or voidable.

That is the meaning of the language in the ordinary acceptation of the words, and it simply declares that the corporation cannot maintain any action on the contract, until it shall have procured the certificate. When it procures the certificate, then it may enforce the obligations of the contract.

There is not a word, syllable or letter or sound that vitiates the contract; the contract is left as pure as the driven snow, this provision only suspending the remedy.

The discussion might appropriately end right here and now. But this conclusion is not going to be left on my own reason in.

In the foreign corporation act of Indiana of 1852 there was this section:

"Section 4. Such foreign corporation shall not enforce in any courts of this state any contracts made by their agents or persons assuming to act as their agents, before a compliance by

such agents, or persons acting as such, with the provisions of sections 1 and two of this act.''

This is the twin of the second quoted provision of our own state.

The supreme court of Indiana adjudged that this section did not make the contracts ''void, but prohibits the enforcement thereof, until the requirements of section 1 and 2 have been complied with''.

Sections 1 and 2, just as does the first part of our statute, prescribed what the agents of such corporation must do, before they can do business in the state. Wood Mowing Machine Co. v. Caldwell, 54 Ind. Rep., 270.

There is a rule, a sort of axiom, that when a law forbids the doing of some act, such as making a contract, that the act, the contract, is thereby made invalid. But this only applies when the thing prohibited is immoral, malum in se, or contrary to public policy.

Both the Indiana Statute and ours prohibit foreign corporations from doing business until they comply with its provisions; but that mere prohibition does not render their contracts invalid. The statute itself, in the second provision I quoted, provides what shall be the effect of the corporation's violation of the statute on its contracts. No court has a right to imagine other effects not nominated in the statute. The enumeration of one effect excludes all others, and there is no opportunity for the application of the axiom I mentioned. Id., pages 276 & 277.

The policy, the reason, for this statute is an influential consideration.

It is to protect citizens of the state in their business transactions with foreign corporations, and to furnish the means by which they can procure personal judgments against such corporations. It was not intended to build a Chinese wall around the state by which the capital and business enterprise of such corporations should be shut out. Id., pages 279 & 280.

It is no source of amazement that the supreme court of Tennessee rendered such a decision as was cited. An examination of the Tennessee statute

will convince one that it could not, have rendered any other decision. Listen to one of its sections;

''That it shall be unlawful for any foreign corporation to do or attempt to do any business, or to own or to acquire any property in this state without having first complied with the provisions of this set, and a violation of this statute shall subject the offender to a fine of not less than $100.00 nor more than $500 at the discretion of the jury trying the case.''

There is no likeness, or even counterfeit, in that provision to our statute. Time will not suffice to consider the statutes and decisions of Colorado, Oregon, Wisconsin and other states; some on one, and others on the other side, of the line.

See Urley v. Clark, Gardner Manfg. Co., 20 Col., 369; Union Insurance Co. v. Smart, 60 N. H., 458; Cincinnati Mut. Health Assurance Co. v. Rosenthal, 55 Ill.; In Re Comstock, 3 Sawyer, 218; Sample v. Bank of British Columbia, 5 Sawyer, 88; Charter Oak Life Ins. Co. v. Lawyer, 44 Wis., 387.

There was no necessity for going out of the state for analogical instruction on this question. By a statute passed April 16th, 1867, the incorporation and regulation of foreign life insurance companies were provided. It was made unlawful for any agent of such companies to act in this state in receiving or procuring applications for life insurance, collecting premiums, or in any manner transacting business, except upon compliance with the terms of the act. This is more peremptory than the law of 1893; and that statute also imposed a penalty of $500.00 fine for violating that provision.

In the Insurance Co. v. McMillin, 24 Ohio St., 67, the company contended that the statute rendered the policy upon which suit was brought void, while the insured insisted that the payment of premiums was unnecessary to maintain her action. The court pronounced that both sides were wrong, that the statute did not, by the neglect of the company to comply with the law, render the policy void; and that such neglect did not excuse the policy

holder from paying the premiums.

Since this opinion was written, I have discovered another case, probably the best considered and most instructive case that has been decided upon this subject, the case of Wright v. Lee, 55 Northwestern Reporter, a case decided in South Dakota, and in that case, some of these cases that I have referred to, are reviewed.

In that case the constitution ordained, that no foreign corporation shall do business in the state without having a place of business in the state designated, and without having an agent upon whom summons may be served. Then the statute following that, superadded, was stronger than ours.

The supreme court of that state decided that there was no remedy except that of quo warranto. That is in perfect consonance with the case in the 47 Ohio St. a case against some insurance company in which the state ousted some company because it failed to obey the law which required it to get certificate first from the superintendent of Insurance, before doing any business.

I find also a case in West Virginia, based upon a statute which provides a penalty just as the Tennessee statute does. Yet the Supreme Court of that state held that an infliction of that penalty did not make the policy or the contract void.

All of the other attacks upon the validity of the contracts are based upon constructions of what, for convenience, is called the charter law of this city.

It may be premised that there is a grave doubt whether any of the provisions of that law relied upon, are at all controlling in this case.

Some of the questions that were mooted, involve the relative powers of the city council on the one side, and the board of public works and the several directors of departments on the other side.

This is the logical outgrowth of the clashing that has been going on between these powers, which is matter of common intelligence.

The charter law is the emasculated federal projet of city government. In spite of its emasculation, there is enough left of it to make quite a vigorous, lusty, federal plan.

One of the seminal principles of that plan, or conception, of government is the division, the distribution, of powers. Being modeled after the system of the federal government, the line of demarkation between the legislative and executive powers is preserved. One of its noticeable features is the augmentation of the power of the executive department. Another is the lack of dependence of one department upon the other, the laudable object being to prevent the pernicuous "log-rolling" you-scratch-my-back-and-I-will-scratch-yours-art so prevelant. The "bewildering vastness and multifariousness of the details of city government is another reason for the increase of executive powers.

It is the manifest intent of our charter law, though it is the federal plan imperfect, that the council shall only exert legislative powers and functions, while the board and the several directors are, with and under the mayor, when the system ripens in 1895, to exercise all of the administrative and executive powers. There is no partition of these powers to be made.

That discretion, judgment, judicial power, as it were, is sometimes conferred on these executive officers, does not detract any from this division of powers, or its wisdom.

In Decamp v. Archibald, 31 Weekly Law Bulletin, 41, Judge Minshall observed;

"Power to hear and determine matters, more or less directly affecting public and private rights is conferred upon, and exercised by, administrative and executive officers."

In this case it was argued that the city council had the authority to make contracts. But there is not a sentence, line or letter of the charter law, which, when the rule of pari materia is applied, sustaines this claim. It may indirectly authorize some contracts, but it has no legal right to make contracts. The claim is opposed to both the genius and let-

ter of the charter law. Making a contract is an executive function. The observation and experience of the unfitness of councils and committees for executive purposes was one of the inspirations of this new plan of city government. The sarcasm on the old plan was, that, by that sort of distribution of power in each city, there was established Dicken's circumlocution offices, where the ambition of official life was "how not to do it".

As to contracts for printing, for an improvement, repairs, or supplies, exceeding $500, the charter law is as plain, as language can make it. The proposals for such contracts are required to be made to the board of public works; the board must accept or reject them; then each director enters into the contracts which pertain to his department.

The council is absolutely without any power over these matters. Any other construction would breed endless confusion, and would fritter away the plain intention of the legislature, whose will the courts must administer.

To make some other contracts, it is not essential that the city council should directly authorize their making. For instance, the heads of departments may, when the necessary appropriation of the money has been made by the council, contract for and make purchases not exceeding $250 at any time for use in their respective departments. Here the law is as plain as it can be.

Again the director of public improvements may advertise and make contracts for lighting the streets, etc., without the concurrence, and even against the opposition, of council and board.

Again, the director of public safety may buy all necessary fire engines, hose carriages, and other apparatus and instruments, and the consent of the council is no more necessary than that of the market master or the turnkey of the city prison.

The council may or may not appropriate the money to carry out these contracts; that is the only limitation it possesses on the power of these executive officers.

After as careful a comparison of the charter law and the statutes relating to the powers of trustees of water-works, as the time would permit, the conclusion has been reached, that some of the provisions of the charter law were not intended to govern the director of public improvements.

Section 58 of the Charter Law provides:

"Except as otherwise provided in this act, all the powers heretofore vested in and performed by the trustees of water-works, trustees of cemeteries, park commissioners, street commissioners and civil engineers in cities of the first grade of the second class, shall be vested in and performed by the director of public improvements, and all laws pertaining to the matters, the administration of which is by this act vested, shall apply to said department and be enforced by the director thereof."

The plain meaning of this is that, unless these powers are by the charter law lodged with some other officer or officers they are bestowed upon the director of public improvements.

Substituting that officer for the trustees of the water-works the following analysis of several sections of the Revised Statutes show what those powers are.

By section 2410 he is authorized to make by-laws and regulations for the efficient management, etc., of the water-works, and such by-laws shall have the same validity as ordinances when not repugnant thereto.

By section 2411, and by the charter law too, the director is empowered to fix the rates of water rents, assess and collect the same. The proceeds are set apart for, and dedicated to, the payment of the expense of conducting and managing and repairing the water-works, and they are to be "collected as other city taxes are".

This demonstrates that they are to be considered as revenue, as a kind of tax.

I will say parenthetically that that last provision is not in the Revised Statutes, but it is in one of the year

books. I was not cited to that.

By section 2412 the surplus of that fund is authorized to be used in the enlargement or extension of the water-works, and for other purposes, not germane, however, to this case.

Section 2413 requires the director to pay the water rents to the treasurer of the corporation, and to make monthly and annual reports to the council.

By section 2414 the water rents are required to be kept as a separate and distinct fund, and it directs how it may be drawn from the treasury on orders.

The last provision of this section is probably not applicable because of its repugnance to provisions of the charter law in reference to the department of accounts.

Section 2415 authorizes the director to make contracts for the building of machinery, waterworks, buildings, reservoirs, and the enlargement and repair thereof, the manufacture and laying down of pipe, the furnishing and supplying of connections, all necessary fire hydrants for fire department purposes, and keeping the same repair, and for all other necessary purposes to the full management and construction of the water-works. There is no provision in the charter law which embraces the whole of this subject and therefore this law is still in force. There may be such a provision in that law covering bids for contracts.

Before the director can make these contracts, involving as they do the expenditure of money, the council would first have to appropriate the money. In this way, that body indirectly authorizes the contracts. That was what was meant a few minutes ago when it was observed that the council may indirectly authorize the making of contracts.

One of the commands of the charter law is that no money shall be drawn from the treasury except on appropriations made by the council. Under this, the councils prerogative is to determine when money shall be expended, and how much shall be expended. and for what purpose it shall be done; but just as soon as that determination

is made, the power of making the contracts by which the money is to be expended, must be exerted by the executive power, and the council has no more right to exert, or participate in, the exertion of that power, than the mayor or any other executive officer has, to pass an ordinance. As a corollary of this, the provision in the ordinance authorizing the purchase of additional pumping machinery requiring the bids to be submitted to the council, is a nullity; it is the evidence of an effort of the council to usurp power which does not belong to it.

By section 2419 of the Revised Statute (still substituting the director of public improvement for the trustee of water-works, which the charter law provides for) the director is required, when work is to be done for the water-works, work within the meaning of previous sections, such as enlargement or extension of the water-works, to advertise for contracts for two weeks, if the estimated cost exceeds $500.00 and he is directed to "contract with the lowest bidder, if, in his opinion, such bidder can be depended upon to do the work with ability, promptness and fidelity; and if such be not the case, he may award the contract to the next lowest bidder, or decline to contract and advertise again".

A narrow construction was sought to be placed on the words "next lowest bidder". They are not to be confined to the second bidder. They signify that the contract may be awarded to any one of two or more bidders who is deemed to have the ability, promptness and fidelity necessary to do the work, in the opinion of the officer or officers awarding the contract. If the lowest nominal bidder does not possess these qualities, he passes on to the next lowest bidder, who then becomes the lowest bidder. If that bidder—the then lowest bidder,—is lacking in any of these qualities, then he passes to the next lowest bidder, and so on till all the bidders are exhausted.

Any other construction would cause an absurd consequence to follow.

One of the perplexing questions in this case is, whether this statute was applicable to the advertisement and

awarding of this contract, or whether the parallel provisions of section 65 of the charter law are to govern.

If the new pumping machinery is an improvement or a repair, or a supply, the charter provision is probably repugnant to section 2419 and must dominate. Obviously, it is an enlargement of the water-works, within the sense of that term as used in section 2412. It is not a repair; nor can it be considered improvement; for that word has a technical meaning. It is used in the same senses in which it is employed in subdivision 1, of chapter 4, of assessments in general. Caldwell v. Carthage, 49 Ohio St., 334.

There is some reason for deeming it a supply. But it is really unnecessary to determine this question; for, whether section 2419, of the Revised Statutes, or section 65 of the charter law governs the advertisement and the acceptance of the Holly Company's bid, the action may be made to harmonize with either. The fact that the other members of the board joined with the director of public improvements in adertising for receiving bids and accepting one of the bids, does not invalidate the latter's action, if the first section named is to prevail. It was nevertheless the executive action of the director; their joining with him was a work of superrogation. If the square and compass of technicality were used in determining this question, a different result would have to be reached.

In this connection may be considered the objection to the validity of the contract based on the claim that it was not awarded to the lowest bidder, as section 2419 required, or the lowest responsible bidder, as the charter law required.

Under either law, a discretion had to be exercised. It had to be decided who was the lowest bidder. The fact that the bids of the other two companies were lower in amount was not conclusive on the question as to which was the lowest bidder. The Holly Company's bid may have been the lowest, although it called for the most money. To illustrate, the advertisement notified bidders that no experi-

mental plans would be considered, and that the designs, the engineers, should be of known and approved forms. By the exercise of judgment, it may have been ascertained that the plans of the other two companies were experimental, or that their designs were not of known and approved forms.

Again, applying section 2419, it may have been found that the other two companies did not have the ability, promptness and fidelity to do the work, or, applying the charter law; that they were not responsible.

If, in the exercise of judgment, upon the information before them, the director, or the board, as the case may be, found these facts to exist, an award of the contract to either of the other bidders would have been a flagrant dereliction of duty and abuse of power.

There are two views concerning the scope of the court's power over public officers who are vested with discretion in the performance of an official act. So long as they confine themselves to such duties as are entrusted to them by law, a court of equity will not interfere to determine whether they are acting wisely or judiciously. Courts can not substitute their analysis, discretion and judgment for these of the officers, unless it appears that their decision was influenced or controlled by corrupt or fraudulent interests and motives, or unless it is so outrageously wrong and inimical to the public interests that, like an irresistible power, the court is driven to the conclusion that they were actuated by a palpable disregard of public duty. McWhorten v. Pensecola & Atl. R. R. Co., 12 Am. St. Rep., 220; Kitchell v. Board of Com'rs., 123 Ind., 543; Wolfels v. Cochran, 34 Pa. St., 361; Detroit v. Hosmer, 44. N. W., 622; New Orleans v. Elevated R. R. Co., 39 La. Am., 127; Chicago v. Eright, 69 Ill., 318; Elk County v. Early, 15 Atl. Rep., 602; Emporia v. Gilchrist, 37 Kas., 532; Sheidley v. Lynch, 95 Mo., 487.

This is the view adcpted by many courts. I have cited only a few of the authorities. Messrs. Smith & Stcd-

dard cite many of them. There is a wilderness of them.

The other view of not so large a number of courts is, that a statute like this is mandatory.

The public officers can not arbitrarily make a contract with a higher bidder, and then escape by saying that it was done in the exercise of discretion. It is incumbent upon them, when their action is challenged for illegality, to prove that the facts justified their determination as to who was the lowest responsible bidder, and their decision is not col.clusive against the courts, they having abundant power to review the exercise of their discretion.

The other construction of such a statute, whose object is to prevent favoritism, corruption, extravagance and improvidence in the procurement of work and supplies for a city or county or state, it is claimed, would nullify the statute.

There is more merit in this view than in the other; the purpose of the statute seems to be, to give the taxpayer a remedy, independent of the rules and doctrines of equity; but, if the supreme court has blazed the way, I am bound to follow it.

Time and again, in mandamus cases, it has been declared that courts will not control the exercise of discretion by public officers. These are decisions at law, and they would be, for better reasons, true in equity. See for last case State ex rel. v. Com'rs., 49 Ohio St., 501.

It is objected that the Holly Company's bid failed to state the respective prices of labor and material. But it was not a bid for labor and material. The pumping machinery could not be dissected so as to show the prices of labor and material that entered into its combination. As Mr. Smith said, it is the "product of a vast amount of skilled and unskilled labor of various and almost numberless kinds, as well also of various materials," the "amounts and quantities" of which is "next to impossible to estimate".

Another objection is that the contract is not based upon any detailed estimate of the whole improvement.

The charter law does not declare who shall make the estimate. The ordinance stated, that the estimate for the said new pumping machinery was $125,000.00. Literally, I presume the requirement means, that if several boilers and engines are contracted for, a detailed estimate of each must constitute the basis of the contract. The council having estimated the cost of the whole machinery there was only a technical and unsubstantial deviation from the requirement.

A consideration of this section of the charter law (66) strengthens the impression that the machinery is neither an improvement nor a repair.

Another objection is that the council never declared, by resolution, the necessity for the improvement under section 2304, of the Revised Statutes. The supreme court, in Caldwell v. Carthage, 49 Ohio St., has defined what improvements are covered by that section, and it is so plain that this pumping machinery is not within the purview of the statute that the subject is dismissed with this brief treatment.

Again, it is claimed that the contract contravenes some law, because no appropriation to purchase the machinery was made by the council. The council did all it could to appropriate the money, if such action was needful; it set apart and appropriated of the water-works funds $125,000.00 for the purchase. By an act passed in 1881 (84 Ohio Laws, page 2), the director of public improvements, as the successor to all of the powers of the trustees of the water-works, was authorized and empowered to purchase pumping engines for the use of the water-works, and it authorized them to be paid for out of the income of the water-works for not over three years.

Since this income must be paid into the treasury, under the charter law it could not be drawn except in pursuance of an appropriation by ordinance; and that was done as effectually as it could be done.

Again, it was claimed that the bids had not been submitted to the council, and that the Holly Company's bid was not ratified by it.

That has already been discussed. The charter law is so much a federal law, in spite of its departure from that plan, that it would be profaned by a decision that the council has such power as is here claimed.

The reservation in the ordinance that the bids should be submitted to the council for approval is an anacronism; it is an attempt to rob the executive department of power which belongs to it.

Again; it is said the contract is invalid because the so-called Burns Law was not obeyed. There was no certificate from the director of accounts that the money to pay for the machinery was in the treasury; but it was not essential. The Burns law in a modified way was re-enacted in section 62 of the charter law. No contract of the city shall be binding unless an appropriation for it has been made, but this does not govern where the contract is pending for a period of one year, upon which payments are to be made as the work progresses as per contract, provided a tax has been levied to pay the estimated expenditures required by such contract, and that the estimate does not exceed the tax.

In such a case the certificate of the auditor need only state the amount of the levy; that it is sufficient to defray the expenditures; and that it has not been appropriated for any other purpose.

It is manifest that neither the Burns law (sec. 2702, of the Revised Statutes) nor this section of the charter is controlling in this case; they have no sort of application.

By an act passed May 4th, 1891, (88 Ohio Laws, page 584) it was declared that money to be derived from taxes, or other revenue in process of collection, or from the sale of bonds duly authorized by law or ordinance should be considered, under a law in spirit like the Burns law, in cities like the first grade of the second class, as being in the public treasury.

The evidence showed that there was to be derived from the sale of bonds issued for the aid of the water-works, duly authorized by both law and ordinance, nearly $90,000.00. The bonds are already deemed to be sold.

Then, again, there is the statute of 1881, which was quoted before, and which authorizes these pumping engines to be paid for out of the income of the water-works for three years.

These are specific laws; the charter law is general law; in a conflict the latter must yield to the former, without regard to the dates of their enactment.

They are limited to special subjects, namely, what is money in the treasury, the purchase of engines by contract, and their payment.

The subsequent general law (section 82 of the charter law) does not operate as a repeal of the other laws; "a power given in particular is not to be taken away by general words;" both stand together, the specific laws being deemed as exceptions to the general law.

Another objection to the validity of this contract is that it runs beyond a year. There are two answers to this:

(1). Section 62, of the charter, just discussed, recognizes the validity of such a contract.

(2). Even if it does not do that, the statute of 1881, does; it recognizes one that runs for three years. As an exception to the general charter law, it curtails the general law.

Again, it was asserted that the contract was invalid because there was no tax levied to pay the contract price. The answer to that has been anticipated. As it is allowable to pay for the pumping machinery out of the money to be derived from the water rents for the next three years, and as, in the absence of evidence showing that it would be insufficient, there was no opportunity or necessity for levying a tax.

The specific statute which allowed this was not repealed by any provision of the charter law.

Again; it is affirmed that the contract is illegal, because the price for the pumping engine is to be paid in installments.

The answer to the last objection is just as masterful as an answer to this objection.

If some of these objections had been sustained, that conclusion would not have resulted in the invalidation of the contract.

In a taxpayer's action under the statute cited, the court is charged "to make such order as the equity and justice of the case demand."

A finding that all of the objections were orthodox would not require a court to decree that the contract should be set aside; because there was no proof, that any injustice was done, or that any inequitable wrong resulted to either the city or any taxpayer.

The injunction will be dissolved, and the plaintiff's action dismissed at his cost.